PEGGY SUE POTREBIC,                )
      Plaintiff,                            )
                                                 )
      v.                                         )      CAUSE NO.: 2:13-CV-126-PRC
                                                 )
CAROLYN W. COLVIN,               )
Acting Commissioner of the           )
Social Security Administration,        )
      Defendant.                            )

## AMENDED OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Peggy Sue Potrebic on April 12, 2013, and Plaintiff's Memorandum in Support of Her Motion for Summary Judgment [DE 19], filed on October 1, 2013. Plaintiff requests that the December 9, 2011 decision of the Administrative Law Judge denying her claims for disability insurance benefits and supplemental security income be reversed for an award of benefits or remanded for further proceedings. On December 13, 2013, the Commissioner filed a response, and Plaintiff filed a reply on January 28, 2014. For the following reasons, the Court grants Plaintiff's request for remand.

## BACKGROUND

Plaintiff Peggy Sue Potrebic suffers from bilateral carpal tunnel syndrome and worsening rheumatoid arthritis in both hands with pain, swelling, and tenderness. She alleges disability due to bilateral carpal tunnel syndrome, arthritis in both hands, chronic lower back pain, and depression.

On June 17, 2010, Plaintiff filed applications for disability insurance benefits and supplemental security income, alleging an onset date of January 8, 2010. The applications were denied initially on October 5, 2010, and upon reconsideration on January 11, 2011. Plaintiff filed a timely request for a hearing, which was held on November 18, 2011, before Administrative Law

Judge ("ALJ") William E. Sampson. In appearance were Plaintiff, her attorney, and vocational expert Thomas Grzesik. The ALJ issued a written decision denying benefits on December 9, 2011, making the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 14, 2014.

2. The claimant has not engaged in substantial gainful activity since January 8, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: mild degenerative joint disease in the hips; disc herniation at C4-C5; mild degenerative disc disease at L5-S1; rheumatoid arthritis; mild arthritis in the hands and major depressive disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform less than the full range of sedentary work as defined in 20 CFR 414.1567(a) and 416.967(a). The claimant could lift/carry and push/pull a maximum of 10 pounds; sit a total of about six hours in an eight-hour workday and stand/walk a total of about two hours in an eight-hour workday. She could only occasionally use her hands. She is limited to simple, repetitive and routine tasks.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born [in 1966] and was 43 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from January 8, 2010, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(AR 11-21).

On February 20, 2013, the Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481. On April 12, 2013, Plaintiff filed this civil action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of the Agency's decision.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

**STANDARD OF REVIEW**

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence

consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ "uses the correct legal standards and the decision is supported by substantial evidence." *Roddy v. Astrue,* 705 F.3d 631, 636 (7th Cir. 2013) (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010); *Prochaska v. Barnhart*, 454 F.3d 731, 734-35 (7th Cir. 2006); *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). "[I]f the Commissioner commits an error of law," the Court may reverse the decision "without regard to the volume of evidence in support of the factual findings." *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)).

At a minimum, an ALJ must articulate his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). An ALJ must "'build an accurate and logical bridge from the evidence to [the] conclusion' so that [a reviewing court] may assess the validity of the agency's final decision and afford [a claimant] meaningful

review." *Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007) (quoting *Scott*, 297 F.3d at 595)); *see also O'Connor-Spinner*, 627 F.3d at 618 ("An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions."); *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001) ("[T]he ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits.").

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that she suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To be found disabled, the claimant's impairment must not only prevent her from doing her previous work, but considering her age, education, and work experience, it must also prevent her from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The steps are: (1) Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to step two; (2) Does the claimant have an impairment or combination of impairments that are severe? If not, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to step three; (3) Do(es) the impairment(s) meet

or equal a listed impairment in the appendix to the regulations? If yes, the claimant is automatically considered disabled; if not, then the inquiry proceeds to step four; (4) Can the claimant do the claimant's past relevant work? If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to step five; (5) Can the claimant perform other work given the claimant's RFC, age, education, and experience? If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At steps four and five, the ALJ must consider an assessment of the claimant's residual functional capacity ("RFC"). The RFC "is an administrative assessment of what work-related activities an individual can perform despite her limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). The RFC should be based on evidence in the record. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(3)). The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ. *Zurawski*, 245 F.3d at 886; *see also Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## ANALYSIS

In support of her request for reversal and an award of benefits or for remand and further proceedings, Plaintiff argues that the ALJ made several errors in determining Plaintiff's RFC and evaluating her credibility. The Court considers each in turn.

### A. Residual Functional Capacity

The RFC is a measure of what an individual can do despite the limitations imposed by her impairments. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004); 20 C.F.R. §§ 404.1545(a), 416.945(a). The determination of a claimant's RFC is a legal decision rather than a medical one. 20

C.F.R. §§ 404.1527(e)(1), 416.927(e)(2); *Diaz*, 55 F.3d at 306 n.2. The RFC is an issue at steps four and five of the sequential evaluation process. SSR 96-8p, 1996 WL 374184, *3 (July 2, 1996). The ALJ's RFC finding must be supported by substantial evidence. *Clifford*, 227 F.3d at 870.

"The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." SSR 96-8p, at *3. The relevant evidence includes medical history; medical signs and laboratory findings; the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations, if available. *Id.* at *5. In arriving at an RFC, the ALJ "must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." *Id.* In addition, he "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe'" because they "may–when considered with limitations or restrictions due to other impairments–be critical to the outcome of a claim." *Id.* Plaintiff attacks several aspects of the ALJ's RFC determination.

1.     *Concentration, Persistence, or Pace*

At step three of the sequential analysis, when analyzing the "paragraph B" criteria, the ALJ found that Plaintiff had "moderate difficulties in maintaining concentration, persistence or pace." (AR 14). As recognized by the ALJ, the limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment, but rather are used to rate the severity of mental impairments at steps two and three of the sequential evaluation process. In the RFC determination, the ALJ included a "limitation to simple, routine, and repetitive tasks." (AR 18). Plaintiff argues that

the ALJ erred by limiting her in the RFC to simple, repetitive, routine tasks to account for her moderate difficulties in concentration, persistence, or pace.

Generally, the medical evidence as well as the ALJ's discussion of that evidence appear to support the mental limitations in the RFC as accommodating Plaintiff's moderate difficulties in concentration, persistence, or pace. However, because the ALJ gave little weight to the opinion of Ann Lovko, Ph.D., the only medical source of record who translated a finding of moderate difficulties in concentration, persistence, or pace into functional limitations, remand is required for clarification of how the ALJ arrived at translating Plaintiff's mental impairment into the RFC limitation.

There are no treatment records by a mental health professional in the record. However, on September 8, 2010, Roger L. Parks, Psy.D. conducted a clinical interview and a mental status examination on behalf of the state agency. (AR 342-45). Dr. Parks noted that Plaintiff reported her physical ailments and that she did not experience any side effects from the medications she was taking for those conditions. Plaintiff reported to Dr. Parks that she experienced frequent crying spells, had become more isolated, was feeling worthless, and entertained suicidal thoughts twice a week. Plaintiff told Dr. Parks that she made a suicide attempt two years earlier with an overdose of Xanax and Lexapro and was hospitalized at Porter Memorial Hospital as a result. She told Dr. Parks that she "pulls [her]self out of it" when she has suicidal thoughts. (AR 342). She reported having a low energy level most of the time and struggled to get out of bed because of her arthritis. Plaintiff reported that she was not then-currently taking any antidepressant medications nor was she involved in counseling.

Discussing her past work, Plaintiff reported that she was terminated from Denny's restaurant in January 2010 for calling off work excessively, which was because of pain in her hands from carpal tunnel syndrome. She also reported having been "fired from jobs due to conflicts with the owner and, on one occasion, as a result of sexual harassment by a colleague." (AR 343).

On mental status examination, Plaintiff appeared depressed as reflected in constricted affect and occasional tearfulness. Dr. Parks found her thought processes rational and coherent. Plaintiff was cooperative and maintained concentration fairly well. She made some errors in proverb interpretation, calculations, and serial sevens. Although she incorrectly stated the number of weeks in a year, she knew the seasons, the month of Labor Day, and the location of the nation's capital. Regarding her current level of daily functioning, Dr. Parks noted Plaintiff's discussion of her activities of daily living, including that she spends time on the computer, listens to music, and reads novels. She reported that she stays home most of the time except for outings to the grocery store and errands with her daughters. She stated that she had difficulty trusting other people and has no current friends. In the "Medical Source Statement," Dr. Parks wrote:

> Based upon results from the Mental Status Examination, it appears that [Plaintiff] is *able to learn, recall, and comprehend simple instructions, and complete simple tasks*. Although she appeared depressed, she was able to interact appropriately with this examiner as she conveyed a pleasant and cooperative demeanor. [Plaintiff] claimed that she has experienced conflicts with supervisors in the workplace which has resulted in a few terminations of previous jobs.

(AR 344) (emphasis added). Dr. Parks gave an Axis-I diagnosis of recurrent major depressive disorder. Dr. Parks did not give an opinion on Plaintiff's functional limitations.

In contrast, on September 14, 2010, Dr. Lovko, a consultative reviewer, completed a Psychiatric Review Technique form, checking the boxes for mild limitations in restrictions of activities of daily living and difficulties in maintaining social functioning and checking the box for

a moderate degree of limitation in difficulties in maintaining concentration, persistence, or pace. (AR 361). Dr. Lovko also completed a Mental Residual Functional Capacity Assessment form. In the section for "sustained concentration and persistence," she checked two of seven boxes as "moderately limited" as opposed to "not significantly limited" for the other five boxes. The two checked boxes were for (1) the ability to maintain attention and concentration for extended periods and for (2) the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (AR 347-48).

Dr. Lovko noted that Dr. Parks opined that Plaintiff was able to learn, recall, and comprehend simple instructions and complete simple tasks and that, despite being depressed, Plaintiff was able to interact appropriately with the examiner. Dr. Lovko found Plaintiff's allegations of symptoms credible as supported by the consulting examiner, although not the medical evidence of record. Dr. Lovko found that Plaintiff's alleged level of severity was only partially credible given that most of her limitations in activities of daily living were because of her physical problems. Dr. Lovko explained that Plaintiff's concentration was moderately impacted but appeared "reasonable for tasks." (AR 349). She further explained that Plaintiff appeared able to tolerate superficial, casual interactions with others. Thus, Dr. Lovko determined that, "[t]o the extent his/her physical condition permits, the evidence suggests that claimant can understand, remember, and carry-out tasks. The claimant can relate on at least a superficial basis on an ongoing basis with co-workers and supervisors. The claimant can attend to task[sic] for sufficient periods of time to complete tasks. The claimant can manage the stresses involved with work." (AR 349).

In including the limitation to simple, routine, and repetitive tasks in the RFC, the ALJ correctly noted the minimal mental health treatment in the record that consisted of "sporadic medication management with no treatment by a mental health professional." (AR 18). In support, the ALJ noted a letter on a facsimile coversheet from Plaintiff's treating physician, Teofilo S. Bautista, MD, dated September 24, 2010, in which he notes in a historical narrative that Plaintiff was started on Xanax for anxiety at some point. The ALJ then discussed the consultative examination by Dr. Parks and Plaintiff's testimony regarding her activities of daily living.

Next, the ALJ gave great weight to the opinion of Dr. Parks that Plaintiff was able to learn, recall, and comprehend simple instructions and complete simple tasks, as consistent with the objective findings. (AR 19). This is the finding the ALJ relied on to formulate the RFC. However, the ALJ gave less weight to Dr. Lovko's opinions that Plaintiff could understand, remember and carry out tasks; relate on a superficial and ongoing basis with coworkers and supervisors; attend to tasks for a sufficient period to complete them; and manage the stresses involved with work. The ALJ explicitly gave less weight to the opinion of Dr. Lovko in favor of giving more weight to the opinion of Dr. Parks.

The ALJ must address a claimant's limitations with regard to concentration, persistence, or pace when assessing the claimant's RFC. *See Stewart v. Astrue*, 561 F.3d 679, 685 (7th Cir. 2009); *Craft v. Astrue*, 539 F.3d 668, 677-78 (7th Cir. 2008). The Seventh Circuit Court of Appeals has held that a limitation to simple, routine tasks in the hypothetical posed to the vocational expert "does not necessarily address deficiencies in concentration, persistence and pace." *See O'Connor-Spinner*, 627 F.3d at 619; *see also Lewis ex rel. J.M. v. Colvin*, (N.D. Ill. Aug. 28, 2014) (summarizing the reasoning behind this holding and case law applying it). The issue in this case is whether the ALJ

properly accounted for Plaintiff's moderate difficulties in concentration, persistence, or pace by incorporating a "limitation to simple, routine, and repetitive tasks" in the RFC.

The Seventh Circuit Court of Appeals has held that an ALJ properly accounts for a claimant's difficulties with concentration, persistence, or pace in the RFC by incorporating a medical expert's translation of moderate limitations in concentration, persistence, or pace into a specific RFC assessment for simple, routine, and repetitive tasks. *See Johansen v. Barnhart*, 314 F.3d 283, 289 (7th Cir. 2002) (holding that the ALJ properly relied on the only medical expert who made an RFC determination and who translated a moderate limitation in the ability to maintain a regular schedule and attendance into the ability to perform low-stress, repetitive work); *see also Milliken v. Astrue*, 397 F. App'x 218, 221-22 (7th Cir. 2010); *Wynstra v. Astrue*, 2:11-CV-437, 2013 WL 550491, at *10-11 (N.D. Ind. Feb. 12, 2013); *Williams v. Astrue*, 1:11-CV-390, 2013 WL 228199, at *6-7 (N.D. Ind. Jan. 22, 2013). In this case, the ALJ gave great weight to Dr. Parks' opinion, and in his medical source statement, Dr. Parks opined that Plaintiff could "learn, recall, and comprehend simple instructions, and complete simple tasks." (AR 344). However, Dr. Parks did not give an opinion on Plaintiff's limitations in concentration, persistence, and pace, and, thus, did not "translate" any findings on mental difficulties.

In contrast, Dr. Lovko made the finding that Plaintiff had moderate difficulties in concentration, persistence, or pace and then opined that Plaintiff can understand, remember, and carry out tasks, can attend to tasks for sufficient periods of time to complete tasks, and can manage the stresses involved with work. The ALJ gave little weight to Dr. Lovko's translated RFC findings, perhaps because they are less restrictive than those of Dr. Parks and because the ALJ found that Plaintiff's mental residual functional capacity was more restricted than opined by Dr. Lovko. Thus,

the ALJ did not rely on any medical expert to translate Plaintiff's moderate limitations in concentration, persistence, and pace into the functional limitation to "simple, routine, and repetitive tasks." In addition, Dr. Parks' medical source statement included a limitation to "simple instructions," which the ALJ neither rejected, included in the RFC, nor explained how it might be incorporated in the limitation to "simple, routine, and repetitive tasks."

Although it may be that the limitation to "simple, routine, and repetitive tasks" is sufficient in this case to accommodate Plaintiff's moderate limitations in concentration, persistence, or pace, the disconnect in the ALJ's weighing of the opinion evidence leaves the Court unable to say that substantial evidence supports the ALJ's decision. *Compare Griffin v. Astrue*, 11 C 5901, 2012 WL 3006982, at *8 (N.D. Ill. July 23, 2012) (finding that the ALJ summarized the medical evidence but did not explain how he made the jump from moderate difficulties in concentration, persistence, and pace to the restriction to simple, routine, and repetitive tasks).

2.      *Limitations in Social Functioning*

Plaintiff argues that the ALJ erred by failing to incorporate any limitations in the RFC to address her inability to interact with persons other than her immediate family. In crafting the RFC, the ALJ did not err when he found that Plaintiff had no difficulty maintaining social functioning. The ALJ cited ample evidence from the record to support his finding, and substantial evidence supports the ALJ's RFC on limitations in social functioning.

First, Plaintiff notes that she testified that, other than her family, she did not communicate with anybody. (Pl. Br. 13 (citing AR 50)). However, in that portion of the hearing, the ALJ asked, "Are you having any trouble being around people or having any trouble dealing with people other than your family?" (AR 50). This was Plaintiff's opportunity to answer that she cannot interact with

others, the public, or supervisors. But she did not. Instead, she answered, "I don't communicate with anybody." (AR 50). Plaintiff was represented by counsel, and her attorney did not elicit different testimony if she did in fact have trouble interacting with others than her family. When considering her testimony as a whole, it appears that Plaintiff does not communicate with anybody else because she rarely leaves her house due to her physical impairments.

Moreover, Plaintiff worked as a server at Denny's restaurant full-time for four years until January 2010. She did not testify that she had any difficulty interacting with management or the customers that she dealt with regularly throughout her shift on a daily basis. Rather, she was fired from that job for excessive absences as a result of her physical ailments.

Plaintiff next points to her statements to Dr. Parks that she has difficulty trusting other people and that she has experienced conflicts with supervisors in the workplace that resulted in termination of a few previous jobs. (AR 344). Dr. Parks noted Plaintiff's report that she had nine jobs in the past fifteen years. Her longest job lasted for eight years at Dune's restaurant as a server. She quit that job shortly after her daughter died. She reported working full time for four years at Denny's restaurant until she was terminated in January 2010 for calling off excessively. She quit another job because of sexual harassment by a colleague.

The ALJ addressed Dr. Parks' notation that Plaintiff claimed that workplace conflict resulted in her termination in the past on the basis that "[t]here is no evidence of this in the record." (AR 19). At the hearing, Plaintiff's attorney acknowledged that Plaintiff was fired from her job at Denny's because of her physical limitations, and the ALJ discussed this fact in his decision. (AR 16, 31).

 Plaintiff then notes that Dr. Parks did not offer an opinion on Plaintiff's ability to function socially in the workplace other than to note Plaintiff's statements. Plaintiff interprets this lack of

statement by Dr. Parks as "implying likely repetition of conflicts in the future." (Pl. Br. 13). The Court disagrees. Given the lack of any other statement in the record, including in Plaintiff's adult disability reports or her hearing testimony, regarding conflicts with supervisors much less being terminated as a result of such conflicts, the more reasonable interpretation of Dr. Parks' lack of opinion on any difficulties with social functioning in the workplace is that he did not feel that any limitations were warranted. Regardless, the fact remains that Dr. Parks did not offer an opinion on social functioning, and the evidence of record does not support the imposition of any.[1]

In her reply brief, Plaintiff illogically attempts to reason that getting fired for "calling off excessively," that being sexually harassed by a coworker, and that quitting a job after her daughter's death are all strong indications of social withdrawal and isolative behavior not inconsistent with the statement that "she does not get along well with others." (Pl. Reply 9). Getting fired for excessive absences due to a physical impairment implies nothing more than that you were fired because you could not do your job. Plaintiff may wish to characterize this is a "conflict" with supervisors, but the conflict would be over her absenteeism and not over social difficulties. Being sexually harassed does not mean that Plaintiff cannot interact with others; that Plaintiff makes this argument is surprising. And, leaving work after the death of a child, an isolated event, does not mean that Plaintiff cannot routinely interact with others; again, it is surprising that Plaintiff makes this argument.

---

[1] Plaintiff cites two cases for the proposition that a doctor's silence cannot be interpreted as substantial evidence for an ALJ's functional capacity determination. (Pl. Br. 7 (citing *Hutsell v. Massanari*, 259 F.3d 707, 712 (8th Cir. 2001); *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988)). In *Hutsell*, a case from the Eighth Circuit Court of Appeals, the doctor was not asked to give an opinion on functional capacity. In this case, Dr. Parks gave a medical source statement. Therein, he chose not to include any limitations regarding social functioning, although he did give an opinion on concentration, persistence, and pace. In *Lamb*, a case from the Eleventh Circuit Court of Appeals, the doctor opined that the claimant's condition was not compatible with his former employment. 847 F.2d at 703. The court noted that while the doctor did not restrict the claimant from light work, neither did he recommend light work, and concluded that "[s]uch silence is equally susceptible to either inference, therefore, no inference should be taken." *Id*.

Next, Plaintiff notes that Dr. Lovko gave great weight to Dr. Parks' medical source statement as consistent with medical evidence of record and activities of daily living data. (AR 349). First, this statement by Dr. Lovko comes at the end of a paragraph that summarizes not only the statement regarding conflicts with supervisors but also Plaintiff's ability to learn, recall, and comprehend simple instructions and to complete simple tasks. Second, Dr. Lovko did not identify what other medical evidence or activities of daily living support Plaintiff's statement that she was fired from previous work due to conflicts with supervisors. Rather, the remainder of Dr. Lovko's functional capacity assessment discusses the evidence related to Plaintiff's ability to concentrate. Then, without other evidence in the record of difficulty interacting with others, Dr. Lovko opined that Plaintiff could relate "on at least a superficial basis on an ongoing basis with co-workers and supervisors." (AR 349). Dr. Lovko's opinion limiting Plaintiff's ability to interact socially was properly rejected by the ALJ as unsupported by the evidence of record.

Plaintiff contests the weight given to this opinion of Dr. Lovko by arguing that the ALJ's reasoning is internally inconsistent. Plaintiff argues that (1) the ALJ gave great weight to Dr. Parks' opinion and (2) Dr. Lovko's opinion on social functioning is supported by Dr. Parks' opinion on social functioning. The problem with Plaintiff's reasoning is that Dr. Parks did not give an opinion on Plaintiff's social functioning; rather, he only reported Plaintiff's statement about conflicts with supervisors. And, the ALJ explicitly and properly rejected that statement made to Dr. Parks as unsupported by the record: "[Dr. Parks] noted the claimant reported she experienced conflict with her supervisors in the past, which resulted in terminations (Exhibit 3F). There is no evidence of this in the record. *Other than the comment relating to social functioning problems*, which was based

upon the claimant's own report, the undersigned gives this opinion great weight as it is consistent with the objective findings discussed in Exhibit 3F." (AR 19) (emphasis added).

Plaintiff argues that the instant case is analogous to *Blanchard v. Astrue*, 10-CV-338, 2011 WL 839535 (E.D. Wis. Mar. 7, 2011), in which the ALJ discounted a physician's findings by relying on an opinion that supported the discounted physician's assessment of social functioning. In that case, the ALJ gave only "conclusory reasons" for giving very little weight to the treating physician's opinion. *Id.* at *5. In a similar vein, Plaintiff argues that the ALJ did not adequately explain why he rejected this portion of Dr. Lovko's opinion, in violation of Social Security Ruling 96-6p. Plaintiff's reliance on *Blanchard* is misplaced and the ALJ did not violate SSR 96-6p because, as set forth above, the ALJ did not give "conclusory reasons" for discounting the weight of Dr. Lovko's opinion on social functioning.

On the June 6, 2010 adult function report, Plaintiff checked the box indicating that her condition affects "getting along with others." (AR 189). However, on the same form, she wrote that she can follow written instructions "well" and spoken instructions "very well." *Id.* On the next page, in response to the question, "How well do you get along with authority figures?" she responded, "very well." (AR 190). The next question asked whether she had been fired or laid off from a job because of problems getting along with other people. She checked the box for "yes," but then her explanation provided: "[I] worked for Denny's for four years as waitress/hostess and because of [my] illness they fired [me]." *Id.* Plaintiff did not offer any examples of being fired *because of* not getting along with others. Plaintiff's mother completed a similar form and did *not* check the box that Plaintiff's conditions affected "getting along with others." (AR 202). She wrote that Plaintiff got

along "ok" with authority figures and, notably, answered "no" to the question of whether Plaintiff had ever been fired or laid off from a job because of problems getting along with other people.

Plaintiff next argues that the ALJ mischaracterizes five aspects of the medical evidence relevant to Plaintiff's mental capabilities. First, Plaintiff maintains that the ALJ reasoned that Plaintiff received no mental health treatment. (Pl. Br. 14). This is incorrect. The ALJ stated that there was "minimal" treatment for depression. (AR 18). The ALJ noted sporadic medication management with no treatment by a mental health professional. *Id.* In support, the ALJ cited the same facsimile note dated September 24, 2010 from Dr. Bautista identified by Plaintiff in her brief that Plaintiff had been prescribed Xanax for anxiety. (AR 368). Although it appears the word "psychiatrist" is written in that note, it is unclear how the word is being used due to the illegibility of portions of the note. Regardless, the ALJ is correct that there are no treatment records from a mental health professional in the record.

Second, Plaintiff points to her March 2011 statement on a disability report appeal form: "In the process on[sic] seeing a therapist for depression, RA pain much worse b/c of cold weather." (AR 216). It is not clear from this statement whether Plaintiff was actually seeing a therapist or was in the process of identifying a therapist. Regardless, there are no treatment records from a therapist.

Third, Plaintiff criticizes the ALJ for stating that "claimant was never psychiatrically hospitalized." (AR 18). Plaintiff points to Dr. Parks' report in which he reported that Plaintiff stated that she had made a suicide attempt two years earlier when she took an overdose of Xanax and Lexapro and was hospitalized at porter Memorial Hospital. (AR 342). Again, this is Plaintiff's report, and there is no evidence of record of this hospitalization. Plaintiff was represented by counsel yet did not provide any hospital records to the ALJ. If this hospitalization occurred, Plaintiff

continued to work as a waitress at Denny's restaurant until January 2010, interacting with supervisors and clients. The ALJ did not err by finding that there was no evidence of record of psychiatric hospitalization. However, because the Court is remanding on other grounds, the ALJ shall discuss Plaintiff's representation to Dr. Parks regarding this hospitalization.

Fourth, Plaintiff argues that the ALJ erred when he found that Plaintiff "complained of prior suicidal ideations, but there is *no evidence* currently indicating this is a problem." (AR 18) (emphasis added). In this regard, the ALJ misstated the record. Plaintiff reported to Dr. Parks that she experienced frequent crying spells, had become more isolated, felt worthless, and "had suicidal thoughts twice a week." (AR 342). Plaintiff fails to note that she also reported to Dr. Parks that she "pulls [herself] out of it" when she has suicidal thoughts and that her children are the main reason that she stays alive. (AR 342). On remand, the ALJ is directed to properly represent Plaintiff's reports to Dr. Parks of suicidal thoughts.

Fifth, Plaintiff misstates the record when she argues that the "ALJ reasons that she was not taking mental health medications, implying treatment was unnecessary." (Pl. Br. 14 (citing AR 15)). Plaintiff misstates the ALJ's discussion at step three, in which he wrote, "The 'paragraph B' criteria findings are supported by the lack of *mental health treatment* received by the claimant as well as the *sporadic medication* taken by the claimant." (AR 15) (emphasis added). The ALJ continued, "For example, in [Dr. Bautista's September 24, 2010 facsimile note] it was noted the claimant took Xanax, but during the psychological consultative examination [with Dr. Parks], it was noted that she was not taking any mental health medications." (AR 15). It is unclear from Dr. Bautista's facsimile note when Xanax was prescribed. Dr. Parks examined Plaintiff on September 8, 2010. There are no treatment notes in September 2010 showing that Plaintiff was prescribed Xanax.

Similarly, Plaintiff argues that the ALJ ignored Larry Brazley, M.D.'s diagnosis of depression. Dr. Brazley is Plaintiff's treating rheumatologist. For the first time in treatment records that began in July 16, 2008, Dr. Brazley wrote the word "depression" in the section for "review of systems" for "psych" on July 21, 2011. (AR 376). Notably, in the section for "Impression" from that visit, he wrote only "RA osteoporosis." *Id*. Nevertheless, he prescribed Effexor. *Id*. Plaintiff is correct that the ALJ did not mention the July 2011 prescription for Effexor. But again, unlike in *Golembiewski*, cited by Plaintiff, the ALJ did not find that Plaintiff's depression did not exist at all. *See Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (holding that the ALJ erred when he mischaracterized evidence and concluded that a condition did not exist at all when there was evidence establishing that it did). Rather, the ALJ found at step two that Plaintiff suffered from major depressive disorder but found that there was no evidence that it impacted her social interactions. None of Plaintiff's attacks on the ALJ's review of the medical evidence requires remand.

Next, Plaintiff argues that the ALJ erred by relying on Dr. Parks' statement that Plaintiff was able to interact appropriately with Dr. Parks and the fact that Plaintiff gets along with her daughters and mother. Plaintiff reasons that her ability to avoid conflict with a psychological examiner once for a limited period of time does not equate with the ability to tolerate interaction with co-workers. Despite its initial appeal, this argument fails because it attempts to create social limitations out of whole cloth. Again, there is no evidence of record, other than one statement by Plaintiff to Dr. Parks, of any difficulty interacting with supervisors or the public, despite Plaintiff's years of work as a waitress. The ALJ cites to Plaintiff's positive interaction with Dr. Parks and her family because it is the only other evidence of record that touches on her social interactions. The ALJ does not equate

Plaintiff's ability to get along with her family with an ability to get along with coworkers; rather, the ALJ includes this as evidence of the larger picture.

Plaintiff's citation to *Fuchs v. Astrue*, 873 F. Supp. 2d 959, 974 (N.D. Ill. 2012), is misplaced. In that case, the ALJ, in assessing the claimant's credibility, failed to address testimony that showed Plaintiff had difficulties with activities of daily living consistent with the medical evidence and relied instead on the fact that the claimant could minimally care for himself. *Id*. Notwithstanding the fact that the cited portion of *Fuchs* deals with a credibility determination and not an RFC analysis, the instant case is distinguishable because here, the ALJ does not favor positive evidence of interactions with family members over record evidence showing difficulty interacting with the public or supervisors, nor does the ALJ ignore evidence of record showing that Plaintiff had difficulty interacting with others. Again, this is a case in which the only evidence of record is evidence of favorable interactions–namely those with Dr. Parks and with Plaintiff's family. Here, Plaintiff looks for support where none exists.

As another basis for seeking reversal of the RFC determination based on purported limitations in social functioning, Plaintiff argues that the ALJ improperly dismissed the significance of Plaintiff's Global Assessment of Functioning ("GAF") score of 50, given by Dr. Parks at the consultative examination. (AR 344). The GAF was a scale developed by the American Psychiatric Association and used by mental health doctors and clinicians to rate a person's "global" functioning at a particular moment in time and to devise a treatment plan.[2] The Seventh Circuit Court of Appeals has recognized that a GAF score is "useful for planning treatment" but does not necessarily reflect

---

[2] Subsequent to Dr. Parks' examination, the GAF score has been phased out in the American Psychiatric Association's 2013 release of the Diagnostic and Statistical Manual of Mental Disorders (DSM-5). A GAF score of 41-50 represents serious symptoms or any serious impairment in social, occupational, or school functioning; a GAF score of 51-60 represents moderate symptoms or moderate difficulty in the same areas of functioning.

a patient's functional level. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). "[N]owhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score." *Id.* (quoting *Wilkins v. Barnhart*, 69 F. App'x 775, 780 (7th Cir. 2003)). In his decision, the ALJ wrote, "The examiner diagnosed the claimant with major depressive disorder–recurrent and assessed her [GAF] score of 50, which the undersigned gives only some weight upon the lack of other mental health evidence suggesting the claimant operates at such a GAF level on a consistent, ongoing basis." (AR 18). The ALJ gave solid reasoning for the weight given to the GAF score, namely the lack of evidence of record.

Finally, Plaintiff contends that, by rejecting Dr. Lovko's finding of "mild" limitations in social functioning, the ALJ substituted his own opinion for that of the medical consultant without relying on other medical evidence. (Pl. Br. 16 (citing *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007); *Scott v. Astrue*, 09-1226, 2010 WL 1433385 (C.D. Ill. Apr. 7, 2010)). The instant lawsuit is not like *Murphy* or *Scott*, in which the ALJ interpreted medical evidence or failed to clarify medical evidence without the assistance of an expert. Again, the ALJ in this case found that there was an absence of evidence in the record supporting limitations in social functioning. Thus, the ALJ did not err in formulating the RFC when he found that Plaintiff does not suffer from limitations in social functioning.

3.    *Mental Limitations Resulting from Ehlers-Danlos Syndrome*

Plaintiff argues that the ALJ's failure to consider that Plaintiff suffered from Ehlers-Danlos Syndrome requires remand. On July 16, 2008, Dr. Brazley, Plaintiff's treating rheumatologist, listed impressions of "Ehlers Danlos type 3" along with bilateral carpal tunnel, rotator cuff, chondromalacia of the right knee, and plantar fasciitis. (AR 301). There is no explanation in the

treatment record of the basis for the diagnosis or which of her symptoms are a result of the disease. There is no mention in the treatment records of Ehlers-Danlos Syndrome since that date.[3] Plaintiff fails to show why the ALJ's omission of the isolated diagnosis of the disease requires remand.

Plaintiff cites *Prak v. Chater*, 892 F. Supp. 1081, 1087 (N.D. Ill. 1995), for the argument that, when an ALJ's decision fails to even mention diagnosed impairments, the court cannot tell whether the ALJ considered the impairment, requiring reversal. First, *Prak* is distinguishable because the ALJ in that case incorrectly found that no examining physician had diagnosed post traumatic stress disorder. *Id*. In this case, the ALJ made no incorrect finding regarding Ehlers-Danlos Syndrome. Second, Plaintiff has not identified any "impairments" that the ALJ failed to mention. Plaintiff notes that several of the symptoms she suffers or allegedly suffers, such as chronic pain, psychological dysfunction, psychosocial impairment, and emotion problems, are common effects of Ehlers-Danlos Syndrome. (Pl. Br. 1, 16-17 (citing http://ghr.nlm.nih.gov/condition/ehlers-danlos-syndrome)). But the ALJ addressed all of these symptoms in his decision. It would have made for a more complete decision if the ALJ had mentioned the diagnosis of the Ehlers-Danlos Syndrome by name, but the failure to do so alone does not require remand.

Finally, Plaintiff contends that the ALJ did not consider the combined effect of Ehlers-Danlos Syndrome on her mental function. There is no medical evidence of record connecting her depression to the 2008 diagnosis of Ehlers-Danlos by Dr. Brazley. At that visit, Dr. Brazley did not identify any mental impairments or diagnosis depression. Notably, Plaintiff did not claim Ehlers-Danlos Syndrome when she applied for disability benefits, did not ask for reconsideration of the initial decision on this basis, and did not testify about the diagnosis at the hearing. Plaintiff's

---

[3] In the September 24, 2010 facsimile letter, Dr. Bautista noted Dr. Brazley's diagnosis of Ehlers-Danlos Syndrome, along with the other diagnoses Dr. Brazley made that day.

attorney did not ask Plaintiff about Ehlers-Danlos Syndrome at the hearing. This is not a case in which the ALJ "blinded" himself to a condition that had some aggregate effect on Plaintiff's other impairments. *See Clifford*, 227 F.3d at 873 (finding that, at step three, the ALJ failed to consider the disabling effect of plaintiff's obesity on her overall condition, and noting that, the ALJ "rather than blind himself to this condition (and other relevant evidence), should have considered the weight issue with the aggregate effect of her other impairments"). The ALJ discussed all of Plaintiff's physical impairments, whether they resulted from Ehlers-Danlos Syndrome or some other disease, and Plaintiff does not show otherwise.

4.      *Limitations in Hand Use in the RFC and Hypotheticals*

Next, Plaintiff asserts that the ALJ erred in including a limitation to occasional use of her hands in the RFC, arguing that the evidence shows that she cannot use her hands even occasionally on a "regular and continuing basis." SSR 96-8p, at *1 ("RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule.").

Plaintiff notes her testimony that she was fired from Denny's due to being unable to work four or five times a month due to hand pain. (AR 32-33, 175). She also suggests that she stopped working as a dispatcher because her hands "clamped up," (Pl. Br. 17 (citing AR 42)). Although she testified that her hands "clamped up" in her dispatching job, which required use of the computer, she did *not* testify that she stopped working at that job because of her hands. *See* (AR 42-43).

Plaintiff points to the July 6, 2010 adult function report that she completed with the assistance of her daughter. *See* (AR 184-191). In her opening brief, Plaintiff attempts to attribute the

statements in this report to her daughter; however, her daughter assisted her in filling out the form because Plaintiff's hands hurt–the statements were Plaintiff's. (AR 191). In the report, Plaintiff wrote that her hands "give out on her" and that she dropped anything she lifted. (AR 187, 189). Plaintiff notes that her mother wrote that Plaintiff no longer cooked because she could not move her hands. (AR 199). She further notes that SSA Interviewer Pokropinski observed that Plaintiff had trouble using her hands and writing and that her fingers were red and swollen. (AR 172). Plaintiff lists Dr. Bautista's notation in his July 26, 2010 consultative examination that Plaintiff's right hand was puffy and Dr. Bautista's physical examination findings that she had reduced right wrist range of motion that day, hyperflexion of the left wrist, and swelling, pain, and tenderness in the finger joints of both hands. (AR 338-39). Plaintiff testified that on days when her hands hurt, she could not unbutton her pants to use the toilet, could not zip her pants, and had problems washing her hair, bathing, and getting dressed. (AR 37, 51, 185). Plaintiff notes her statement in her March 2, 2011 appeal disability report that "on bad days will stay in bed or sit w/heating pad. Won't cook or clean or shower if having a bad day. 3–4 bad days a week." (AR 219).

Plaintiff is correct that the ALJ only articulated Plaintiff's ability to use her hands "occasionally" in the context of a single eight-hour work period and did not specifically articulate whether she could "occasionally" use her hands on a "regular and continuing basis," which contemplates a forty-hour work week. (Pl. Br. 18 (citing *Gotz v. Barnhart*, 207 F. Supp. 2d 886, 897 (E.D. Wis. 2002) (citing *Wallace v. Apfel*, No. 97-CV-6912, 1998 WL 967376, at *4 (E.D. Pa. Nov. 24, 1998)); *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001)).[4] Plaintiff reasons that there is

---

[4] Plaintiff also cites, without analysis, *Bauer v. Astrue*, 532 F.3d 606 (7th Cir. 2008). The court in *Bauer* commented that a "person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days." *Id.* at 609. Plaintiff makes no argument that she is under continuous treatment for her hand pain with "heavy drugs" that would result in the type of "better days and

evidence that she has "good days" and "bad days" and that the ALJ only relied on the "good days." Plaintiff concludes that, because the ALJ failed to determine the number of days each month (or week) that Plaintiff could not use her hands, even occasionally, and failed to incorporate such a finding into the hypothetical before the vocational expert, the ALJ committed legal error.

Plaintiff has not cited mandatory authority that an ALJ must make a specific articulation of the frequency of "bad days," and the Court has identified only three cases that have cited *Gotz* for this holding, each of which contained a myriad of other errors that required remand. *See Beach v. Astrue*, NO. 09-CV-2897, 2010 WL 3168292, at *12 (N.D. Ill. Aug. 4, 2010); *Brown v. Barnhart*, 298 F. Supp.2d 773, 795 (E.D. Wis. 2004); *Silva v. Barnhart*, No. 02C5681, 2003 WL 22425010, at *10 (N.D. Ill. Oct. 23, 2003). The Court does not find these cases persuasive in light of the ALJ's thorough analysis of the medical evidence and testimony regarding Plaintiff's hands.

Generally, the ALJ's analysis of the record evidence regarding Plaintiff's hands was reasonable and thorough. In his decision, the ALJ noted the sparse medical treatment, mild testing and examinations, improvement with treatment, routine care, and the fact that no medical source found greater limitations were warranted. The ALJ noted that x-rays of Plaintiff's hands and wrists demonstrated only mild arthritic changes and unremarkable findings with her wrists except for the presence of positive ulnar variance. *See* (AR 17, 249-55, 261-64, 380, 381-82).[5] And, the ALJ gave

---

worse days" scenario at issue in *Bauer*.

[5] In her recitation of the facts, Plaintiff omits, on several occasions, the descriptive word "mild" when reciting objective medical findings. The omission of the qualifier "mild," if intentional on each occasion, borders on misrepresentation of the evidence of record. *See* (Pl. Br. 6 (citing AR 304-05 ("*mild* degenerative changes in the medial compartment"), AR 319 ("*mild to moderate* medial degenerative changes"); 7 (noting that the ALJ ordered x-rays of Plaintiff's hands but failing to include the "normal" findings for all of the x-rays) (citing AR 261-62, 265, 267, 269, and failing to cite AR 264)).

Plaintiff the benefit of the doubt in relation to Dr. Brazley's treatment records by finding that she was limited to only occasional use of her hands.

The ALJ went on to cite the July 2010 consultative examination with Dr. Bautista. Plaintiff cites portions of this examination but omits numerous observations by Dr. Bautista that the ALJ cited and that support the ALJ's determination. Both Plaintiff and the ALJ note that Dr. Bautista found that Plaintiff exhibited some pain and tenderness in her wrists and some reduced flexion and dorsiflexion. However, upon examination, Plaintiff was able to close both hands, her fingers were not contracted, she was neurologically intact, her grip strength was good bilaterally, she was able to button and pick up coins, and she had no hand tremors or atrophy. The ALJ noted that Plaintiff was able to drive and used the computer. These findings and the ALJ's determination are further supported by the state agency reviewing medical experts, Dr. Sands and Dr. Gange. (AR 369, 374). This medical evidence is entitled to greater weight than the non-medical observation of SSA Interviewer Pokropinski. And, Plaintiff's testimony regarding pain caused by working as a waitress at Denny's restaurant, where she was likely using her hands continuously, does not negate the RFC limitation to occasional use of her hands, which means up to one third of the day. The ALJ did not doubt that working as a waitress caused Plaintiff to experience hand pain; the ALJ found that Plaintiff could not return to her prior work.

In another attempt to claim error where none exists, Plaintiff incorrectly describes the ALJ as equating her ability to use her hands on "good" days with the ability to occasionally use her hands on a regular and continuing basis. The ALJ made no such finding. Rather, by considering all the evidence of record, the ALJ found that Plaintiff's use of her hands was not as limited as she claims. As argued by the Commissioner, Plaintiff offers no explanation as to how "mild" or "normal" x-rays

only reflect "good" days. The ALJ considered longitudinal factors, such as Plaintiff's sparse and conservative medical treatment over time. Plaintiff is essentially arguing that her bad days only occurred when she did not seek medical treatment and that every time she visited a medical source, she was having a good day.

However, because the Court is directing the ALJ to fully discuss Plaintiff's testimony regarding her hand limitations, as discussed in the credibility section below, the Court directs the ALJ to incorporate that fuller discussion into the RFC determination regarding Plaintiff's occasional use of her hands on a regular and continuing basis.

5.      *Limitations in Ability to Sit in the RFC*

Finally, Plaintiff argues that the RFC does not reflect her physical limitations regarding the ability to sit for prolonged periods. Plaintiff notes that she testified at the hearing and told Dr. Bautista at the consultative examination on July 26, 2010, that she can sit for half an hour to forty minutes before low back pain causes her to change positions. (AR 38, 338). She also notes that, at the examination, Dr. Bautista observed that Plaintiff could not sit for long on the examination table.[6] Based on these facts, Plaintiff argues that the ALJ should have included a sit/stand option or the option for routine breaks in the RFC and that the ALJ failed to explain how he determined that she can sit for six hours out of each workday without the necessity for extra irregular breaks.

The ALJ thoroughly reviewed the medical evidence of record regarding Plaintiff's lower back pain, none of which Plaintiff discusses. The ALJ noted that, in connection with Dr. Bautista's consultative medical examination, Plaintiff underwent a lumbar spine MRI, which showed only mild

---

[6] Plaintiff also cites the notation by Dr. Brazley that, during arthroscopic knee surgery in 2008, Plaintiff was unable to maintain knee flexion. (AR 319). However, this notation was made while performing the medical procedure and has not been repeated in the course of any physical examination.

degenerative disc disease at L5-S1 and that the rest of her disc spaces were unremarkable. The ALJ noted that the "medical evidence in this case is sparse . . .[with] [m]ost of it derived from the State agency medical doctors or the consulting doctors." (AR 16). Plaintiff has not identified any treatment records for lower back pain since her onset date, and the Court has not found any.[7] A March 29, 2010 treatment record from Dr. Brazley lists complaints of hand, wrist, knee, and ankle pain but does not list back pain. (AR 292). Similarly in April 2010, Plaintiff was seen for follow up for rheumatoid arthritis and cervical radiculopathy with complaints of pain in both hands; there is no complaint of back pain. In June 2010, Plaintiff complained of neck pain and hand pain but no back pain. In reviewing Dr. Bautista's consultative examination, the ALJ noted that, on examination, Plaintiff had some pain, tenderness, and muscle spasm in the lumbar spine area and that she refused to participate in the range of motion testing. (AR 18). He then noted that her back pain "is not entirely supported by the mild diagnostic findings mentioned above." *Id.*

Plaintiff cites *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009), in which the ALJ found that no medical evidence showed that the plaintiff could not sit for six hours and the plaintiff argued that the ALJ failed to discuss how the plaintiff's obesity affected her ability to sit. *Id.* There is no such similar omission of a medical condition in the instant case. Unlike the impact of obesity on the plaintiff's ability to sit in *Villano*, there is no obvious impact that Ehlers-Danlos Syndrome has on Plaintiff's other impairments, and Plaintiff has not offered medical evidence to demonstrate any such additional limitations that the ALJ did not consider.

---

[7] There are physical therapy records from 2008 that show decreased lumbar and cervical ranges of motion and reduced low back muscle strength. *See* (AR 308, 309, 311). The physical therapist wrote that poor posture was exacerbating her symptoms, and physical therapy was provided to improve her posture. Plaintiff's treatment notes with Dr. Brazley throughout 2008 and 2009 list pain in various joints but do not list complaints of back pain.

Finally, Plaintiff argues that the ALJ erred by not explaining why he rejected Plaintiff's testimony that she could sit for only half an hour at a time. (Pl. Br. 20 (citing *Rodriguez v. Astrue*, 09 C 1810, 2010 WL 2136672 (N.D. Ill. May 26, 2010); *Brown*, 298 F. Supp. 2d at 799). However, the "RFC assessment is a function-by-function assessment, . . . [and] the expression of a claimant's RFC need not be articulated function-by-function; a narrative discussion of a claimant's symptoms and medical source opinions is sufficient." *Knox v. Astrue*, 327 F. App'x 652, 657 (7th Cir. 2009) (internal quotation marks and citations omitted). The ALJ did not err by not including a sit/stand option in the RFC.

## B. Credibility

In making a disability determination, the ALJ must consider a claimant's statements about her symptoms, such as pain, and how the claimant's symptoms affect her daily life and ability to work. *See* 20 C.F.R. §§ 404.1529(a), 416.929(a). Subjective allegations of disabling symptoms alone cannot support a finding of disability. *Id.* In determining whether statements of symptoms contribute to a finding of disability, the regulations set forth a two-part test: (1) the claimant must provide objective medical evidence of a medically determinable impairment or combination of impairments that reasonably could be expected to produce the alleged symptoms; and (2) once an ALJ has found an impairment that reasonably could cause the symptoms alleged, the ALJ must consider the intensity and persistence of these symptoms. *Id.*

The ALJ must weigh the claimant's subjective complaints, the relevant objective medical evidence, and any other evidence of the following factors:

(1)     The individual's daily activities;
(2)     Location, duration, frequency, and intensity of pain or other symptoms;
(3)     Precipitating and aggravating factors;
(4)     Type, dosage, effectiveness, and side effects of any medication;

(5)     Treatment, other than medication, for relief of pain or other symptoms;

(6)     Other measures taken to relieve pain or other symptoms;

(7)     Other factors concerning functional limitations due to pain or other symptoms.

*See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). An ALJ is not required to give full credit to every statement of pain made by the claimant or to find a disability each time a claimant states she is unable to work. *See Rucker v. Chater*, 92 F.3d 492, 496 (7th Cir. 1996). However, Ruling 96-7p provides that a claimant's statements regarding symptoms or the effect of symptoms on her ability to work "may not be disregarded solely because they are not substantiated by objective evidence." SSR 96-7p, 1996 WL 374186,at *6 (Jul. 2, 1996). "Because the ALJ is 'in the best position to determine a witness's truthfulness and forthrightness . . . this court will not overturn an ALJ's credibility determination unless it is 'patently wrong.'" *Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012) (quoting *Skarbek v. Barnhart*, 390 F.3d 500, 504-05 (7th Cir. 2004)); *see also Prochaska*, 454 F.3d at 738. Nevertheless, "an ALJ must adequately explain his credibility finding by discussing specific reasons supported by the record." *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013) (citing *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009)).

As an initial matter, Plaintiff criticizes the ALJ's use of "boilerplate" language in the credibility determination. The ALJ found that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (AR 26); *see, Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). However, an ALJ's use of the boilerplate language does not amount to reversible error if he "otherwise points to information that justifies his credibility determination." *Pepper*, 712 F.3d at 367-68. Recently, the Seventh Circuit Court of Appeals has rekindled its criticism of the boilerplate language because the language's "implication . . . is that residual

functional capacity (ability to engage in gainful employment) is determined *before* all the evidence relating to the claimed disability assessed, whereas in truth all that evidence is material to determining the claimant's residual functional capacity." *Browning v. Colvin*, No. 13-3836, — F.3d — , —, 2014 WL 4370648, at *3 (7th Cir. Sept. 4, 2014); *see also Goins v. Colvin*, No. 13-3729, — F.3d —, —, 2014 WL 4073108, at *3 (7th Cir. Aug. 19, 2014). In this case, the use of "boilerplate" language does not require remand because the ALJ considered the required factors in assessing Plaintiff's credibility and analyzed the evidence. *See Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012).

As with the RFC determination, Plaintiff offers several criticisms of the ALJ's credibility determination. A review of each reveals that the ALJ's credibility determination was not patently wrong. However, because the Court is remanding on the RFC, the Court directs the ALJ to provide a more thorough analysis of certain aspects of Plaintiff's credibility.

First, Plaintiff argues that the ALJ improperly relied on an eight-month break in treatment with Dr. Brazley between June 23, 2010, and February 21, 2011. Plaintiff contends that the ALJ should not have drawn any inference from a failure to seek or pursue regular medical treatment without first considering any explanations she may have provided or other information in the case record that may explain infrequent or irregular medical visits or the failure to seek medical treatment. (Pl. Br. 21 (citing *Brown*, 298 F. Supp. 2d at 797-98)). In support, Plaintiff points to her hearing testimony that she does not have any money. (AR 45). Plaintiff fails to note the follow-up question asking whether she had health care and her response that she had Medicaid. (AR 45-46). At no point did Plaintiff testify that she could not afford to treat with Dr. Brazley. Plaintiff also notes that "[a]t one point, Dr. Brazley was unable to perform tests due to lack of insurance." (Pl. Br. 22

(citing AR 296, 335)).[8] First, the treatment record at page 296 is dated November 2008, two years before the period at issue. Second, even if Plaintiff could not have "testing" done in November 2008 due to a lack of insurance, she was still able to treat with Dr. Brazley because he saw her that day. And, she was actively treating with Dr. Brazley throughout that time period, with visits on July 16, 2008, August 8, 2008, August 17, 2008, September 16, 2008, and November 13, 2008. On September 22, 2008, Dr. Brazley performed surgery on Plaintiff's right knee, and on November 17, 2008, he performed surgery on her left knee.

In her brief, Plaintiff offers no explanation for why she did not treat with Dr. Brazley during that period. The ALJ's reference to the eight-month period with no treatment records was only one aspect of the credibility determination, and the failure to request further explanation from Plaintiff in this instance does not require remand. *See Nicholson v. Astrue*, 341 F. App'x 248, 252 (7th Cir. 2009) ("[Plaintiff] did not hint that his infrequent treatment or failure to seek treatment was due to inability to pay for treatment.") (citing *Craft*, 539 F.3d at 679 (explaining that inability to afford treatment is one reason that can "provide insight into the individual's credibility"); *compare Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) (recognizing that an ALJ must explore the claimant's reasons for lack of medical care before drawing a negative inference and that an ALJ may need to question the individual at the administrative hearing to determine the reasons for gaps in treatment, and finding in that case that the reason for the gaps was obvious because the plaintiff suffered from a condition that may wax and wane). Nevertheless, because the Court is remanding on other grounds, the ALJ will have an opportunity to question Plaintiff regarding the lack of treatment during those eight months.

---

[8] Third, page 335 is a medication log sheet that says nothing about insurance or an inability to pay.

Second, Plaintiff contends that the ALJ played doctor by discounting Plaintiff's credibility on the basis that "her body systems were noted as generally within normal limits as well as her current sed. rates." (Pl. Br. (citing AR 17 (citing Exh. 12F))). A "sed rate" or "erythrocyte sedimentation rate" "is a blood test that can reveal inflammatory activity in your body" and is used if a doctor suspects rheumatoid arthritis. Mayo Clinic, http://www.mayoclinic.org/tests-procedures/sed-rate/basics/definition/prc-20013502 (last visited September 17, 2014). On March 23, 2011, a hematology report showed a sed rate of 4 with a reference range of 0-20. On April 21, 2011, a hematology report showed a sed rate of 17 and a reference range of 0-20. (AR 385). Without including these test results in her brief, Plaintiff argues that no doctor commented on the significance of the "sed rate" and that no doctor concluded that an examination of Plaintiff's "body systems" indicates remission of disease or relief from symptoms. (Pl. Br. 22). Plaintiff is correct that no doctor commented on the March and April 2011 sed rates. But Plaintiff's failure to acknowledge in her brief that her sed rate tests were within the normal range is telling. As for Plaintiff's "body systems," at the February and March 2011 exams, Dr. Brazley checked a box for "WNL" (within normal limits) for each of the listed body systems. (AR 378, 379). At the April, June, and September 2011 visit, no boxes were checked. (AR 375, 376, 377). Plaintiff ignores this evidence.

Plaintiff also suggests the ALJ erred by concluding that "the medications appeared to help, because on a later date, the claimant's complaints of radicular pain were nonexistent." (Pl. Br. 22 (citing AR 17)). The ALJ first referenced a July 21, 2011 treatment note by Dr. Brazley that Plaintiff complained of increased radicular pain and then commented that the medications appeared to help because the following treatment record, dated September 29, 2011, did not contain a statement

regarding pain. This is true. At the July 21, 2011 visit, Plaintiff was started on Simponi, which is used to treat rheumatoid arthritis. In her brief, Plaintiff notes only records from 2008–a July 16, 2008 treatment note by Dr. Brazley that the "pain tends to come and go, lasting for several days," (AR 300), and an August 12, 2008 physical therapy treatment note that she reported that her symptoms occurred "randomly" and in varying parts of her body, (AR 308). Plaintiff does not point to any evidence, other than her own testimony, that her new medication did not relieve or improve her symptoms during the time period discussed by the ALJ.

Plaintiff cites *Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009), in which the ALJ "played doctor" by reaching his own conclusion based on the fact that the plaintiff was not taking insulin. The court found that no doctor had given any reason why insulin was not prescribed. *Id*. In this case, the ALJ did not draw inferences that were not supported by the record and did not play doctor. Rather, the ALJ recited the objective medical evidence and referenced the treating physician records to support his credibility determination.

Third, Plaintiff argues that the ALJ erred by discounting Plaintiff's credibility on the basis that Dr. Brazley "never indicated the claimant was unable to work, and the claimant's last visit was in September of 2011." (Pl. Br. 23 (citing AR 17)).[9] Plaintiff argues that it is a non sequitur that Dr. Brazley did not authorize her to be off work in 2010 and 2011 because the March 29, 2010 treatment record shows that Dr. Brazley knew she was not working. (AR 292). Plaintiff misunderstands the ALJ to have found no evidence of "off work slips" when he in fact wrote, "Dr. Brazley never indicated the claimant was unable to work." (AR 17). The ALJ's point was that, from her onset date,

---

[9] Plaintiff contends that Dr. Brazley twice previously authorized Plaintiff to be off work for six weeks. Plaintiff is correct that in August 2008, Dr. Brazley gave Plaintiff an "off work" slip for "Ehlers-Danlos/Plantar Fasciitis" for six weeks. (AR 314). However, the second record cited by Plaintiff, dated July 28, 2009, only excuses Plaintiff from work for that date, and it was noted that her next appointment was in six to eight weeks. (AR 325).

no doctor opined that Plaintiff should not be working. However, it does not appear that Dr. Brazley was asked to give an opinion on whether Plaintiff could work, and it is not apparent from the treatment records that he would include such a statement unless faced with a need for Plaintiff to be off work. Because she was not working, it is logical that he would not make such a statement on his own. On remand, the ALJ shall either discard this reasoning or explain in his decision why Dr. Brazley would have made a statement regarding the ability to work in his routine treatment records.

Fourth, Plaintiff argues that the ALJ erred by reasoning that, because Dr. Brazley ordered no physical therapy, occupational therapy, acupuncture, chiropractic or surgical treatment, Plaintiff's symptoms were "mild and managed by medication therapy." (AR 17). Plaintiff argues that the ALJ plays doctor because no physician indicated that any of these treatments listed by the ALJ would benefit Plaintiff at that point in time. Plaintiff argues that the ALJ failed to note that she had surgery on her knees in 2008 and had physical therapy in 2008.[10] Plaintiff also argues that the ALJ fails to note that she had been prescribed Vicodin and Morphine for her pain in 2010, that Plaintiff testified that she took long showers to relieve her pain and wrapped her hands in heating pads, and that Plaintiff received monthly injections for her arthritis. Plaintiff argues that the ALJ failed to consider that her use of home remedies demonstrates that her pain is not controlled by medication. She wrote in her March 2, 2011 appeal disability report that on bad days she stays in bed. Plaintiff criticizes the ALJ for dismissing her testimony that she uses wrist braces on the basis that they were not prescribed by a physician; Plaintiff points to Dr. Brazley's initial treatment record from July 2008 in which he recommended wrist splints. (AR 301).

_____

[10] Plaintiff contends that she had physical therapy by a hand specialist. (Pl. Br. 24 (citing (AR 316))). However, that record is a prescription for physical therapy that has a line drawn through it, and there are no physical therapy records from the Centers for Hand & Physical Rehabilitation.

Yet, in making this statement regarding the absence of any other modalities of treatment, the ALJ was noting that Plaintiff's treatment was mostly routine. He correctly commented that her "2011 treatment with Dr. Brazley consisted mostly of routine, follow-up visits and medication check-ups[sic] refills." (AR 17). Plaintiff does not include this portion of the ALJ's reasoning or dispute it. The ALJ is correct that no doctor prescribed any more aggressive treatment than medication management. Also, contrary to Plaintiff's assertion, the ALJ noted the physical therapy and knee surgery in the medical history; moreover, these events took place in 2008 before Plaintiff's onset date and were related to her knee pain, which the ALJ found to not be a severe impairment. Nevertheless, because the case is being remanded on other grounds, the ALJ will have an opportunity to discuss Plaintiff's medications, home treatment remedies, and Dr. Brazley's 2008 splint recommendation.

Fifth, Plaintiff argues that it does not follow that symptoms are "mild" if managed by medication because many serious conditions are managed by medication, and Plaintiff notes that the ALJ does not address her testimony that her medications do not control her hand pain. (AR 41, 45). Although the overall evidence of record supports the ALJ's findings that her symptoms are mild, on remand, the ALJ shall address this testimony. Plaintiff also contends that the ALJ did not consider the side effects of her medications, pointing to her testimony that her medication makes her drowsy, sleepy, tired, and sick to her stomach. (AR 49, 50, 218). However, Plaintiff told consultative examiner Dr. Parks that she does not suffer any side effects from her medications. (AR 342). On remand, the ALJ shall incorporate this evidence regarding side effects in the credibility determination.

Sixth, Plaintiff takes issue with the ALJ's reference to the fact that on one occasion, Dr. Brazley questioned whether her pain complaints might be psychogenic in nature. (Pl. Br. 24 (citing (AR 17))). In *Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004), the court explained that "[e]ven where the source of Plaintiff's pain is psychological rather than physical, if pain is disabling, the fact that its source is purely psychological does not disentitle the applicant to benefits." However, the ALJ did not discount Plaintiff's credibility based on this statement of Dr. Brazley's treatment record and the ALJ did not find that she was not entitled to benefits based on this statement. In fact, the ALJ concluded that, despite the limited evidence from Dr. Brazley's most recent treatment records, the ALJ gave Plaintiff "the benefit of the doubt and [found Plaintiff] limited to less than sedentary work with occasional use of her hands." (AR 17).

Finally, Plaintiff argues that the ALJ mischaracterized her activities of daily living. The ALJ noted Plaintiff's testimony that she is able to drive and commented that driving "involves excessive hand gripping." (AR 18). Plaintiff argues that the ALJ knew Plaintiff did not have a car and relied on others to drive her places because the ALJ stated so in the decision. Yet, the ALJ did not explain how being able to drive occasionally equates to being able to use her hands up to one third of the day over the course of a forty-hour work week. Plaintiff notes that the ALJ did not discuss her statements on the adult disability report that she has trouble opening the car door, turning on the car, and steering the wheel. (AR 187). On remand, the ALJ shall discuss these additional facts when considering Plaintiff's ability to drive. As for her use of the computer, the ALJ noted that Plaintiff goes on the computer, "which involves significant hand usage," and found that this "suggests the claimant is at least able to use her hands to some degree for manipulative purposes." (AR 18). The

ALJ did not note her testimony that Plaintiff was not on the computer often. On remand, the ALJ shall discuss these additional facts as well.

### C.  Request for an Award of Benefits

Finally, Plaintiff asks that the Commissioner's decision be reversed and remanded for an award of benefits. An award of benefits, however, is appropriate "only if all factual issues involved in the entitlement determination have been resolved and the resulting record supports only one conclusion—that the applicant qualifies for disability benefits." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Briscoe*, 425 F.3d at 356)). This is not one of those rare situations. Although Plaintiff requests an award of benefits, Plaintiff fails to present an argument in favor of doing so. Accordingly, this matter is remanded for further proceedings.

### CONCLUSION

Based on the foregoing, the Court hereby **GRANTS** the relief sought in Plaintiff's Memorandum in Support of Her Motion for Summary Judgment [DE 19], **REVERSES** the final decision of the Commissioner of Social Security, and **REMANDS** this matter for further proceedings consistent with this Opinion and Order. The Court **DENIES** Plaintiff's request to award benefits.

So ORDERED this 22nd day of September, 2014.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record